**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **MELLISSA HAMMONS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **CIVIL NO. 05-0613-WS-C** |
| | ) |
| **COMPUTER PROGRAMS AND** | ) |
| **SYSTEMS, INC. (CPSI),** | ) |
| | ) |
| **Defendant.** | ) |

**ORDER**

This matter is before the Court on defendant's Motion for Summary Judgment (doc. 26). The Motion has been briefed and is now ripe for disposition.

**I.     Background.**[1]

On October 25, 2005, plaintiff Mellissa Hammons ("Hammons") initiated this employment discrimination action against defendant Computer Programs & Systems, Inc. ("CPSI").  The two-count Complaint (doc. 1) alleged that CPSI had terminated Hammons' employment on October 29, 2004 on the basis of her gender and age, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.* ("ADEA").  At the close of discovery, CPSI moved for summary judgment as to both theories.[2]

---

[1]     The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party.  *See Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1217 (11th Cir. 2005).  Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in her favor.

[2]     The parties' summary judgment filings devote extensive attention to collateral factual matters that need not (and often may not) be considered in order to resolve the pending Rule 56 Motion.  Notwithstanding the multiplicity of affidavits (including a 44-paragraph, 13-page offering from Hammons), the hundreds of pages of deposition transcripts, and the thousands of other pages of exhibits that comprise the summary judgment record, the relevant facts are generally straightforward.

**A.      Hammons' Employment at CPSI.**

Hammons was hired by CPSI as a Software Support Representative in June 1985. (Hammons Aff., ¶ 4.)  She ascended quickly in the ranks of CPSI, which at that time was a fledgling entrant in the healthcare information technology sector with emphasis on community hospitals.  As Hammons rose to prominence in CPSI, so too did CPSI experience marked success and profound growth.  By 2004, the company's total revenues were $82.7 million, and its customer base consisted of some 530 hospitals spread across 45 states.  (Plaintiff's Exh. C, at 22, 25.)  By 2001, Hammons had been named CPSI's Vice President of Financial Software Services, in which capacity she received annual compensation of $350,000, in addition to a benefit package including health insurance and stock.  (Douglas Aff., at 2.)[3]  In her capacity as Vice President, Hammons reported to J. Boyd Douglas ("Douglas"), the Executive Vice President and Chief Operating Officer of CPSI.

Hammons was the only female among CPSI's five Vice Presidents.  (Hammons Aff., ¶ 12.)  With respect to age, as of 2004, Hammons ranked third among the five Vice Presidents.  In descending order, their ages were 55 (Stephen Walker), 53 (Thomas Peterson), 47 (Hammons), 46 (Victor Schneider), and 34 (Patrick Immel).  (Plaintiff's Exh. C, at 17-18.)[4]  CPSI's President, David A. Dye, and Douglas were aged 35 and 38, respectively.  (*Id.* at 17.)

**B.      Hammons' Discharge in October 2004.**

On October 28, 2004, Douglas recommended to the Executive Committee of CPSI's Board of Directors, as well as to Dye, that Hammons' employment be terminated.  (Douglas Aff., at 1.)  Douglas outlined this recommendation in a two-page Memorandum dated October

---

[3]      Indeed, payroll documents in the record reflect that on January 1, 2001, Hammons received a pay increase of more than 450%, from $75,000 per year to $350,000 per year. (Plaintiff's Exh. L.)  This increase was awarded to Hammons and to other executives to help them repay $1 million loans that each of them took in order to purchase CPSI stock.  (Hammons Aff., ¶ 11.)

[4]      Walker and Peterson remain at CPSI in their Vice President roles today. (Douglas Dep., at 70-71.)

27, 2004.  (Plaintiff's Exh. E.)[5]  The Memorandum focused on Hammons' involvement with a childrens' apparel and stitchery company called Itz4Me Stitchery ("Itz4Me"), which she and her husband owned.  In particular, Douglas's Memorandum chronicled events in November 2001, in which Hammons had utilized the services of her CPSI administrative assistant, Janet Massey, in the Itz4Me business, including having Massey work an Itz4Me booth at the Mobile Christmas Jubilee during regular business hours.  (*Id.*)[6]  The Memorandum indicated that Douglas had counseled Hammons about this matter in November 2001, instructing her that "CPSI employees should NEVER be used to perform any duty for Itz 4 Me, even on their own time."  (*Id.*)  The Memorandum further stated that Douglas had informed Hammons that "she would risk losing her job" if she ever utilized Massey's services on Itz4Me business again.  (*Id.*)  During this same meeting, the Memorandum continued, Douglas had notified Hammons that she was expending excessive CPSI time on Itz4Me, to the point where she did not appear fully dedicated to her CPSI job.  (*Id.*)

According to the Memorandum, the issue arose again 6 months later when an Itz4Me advertisement in a local magazine, *Mobile Bay Monthly*, listed a CPSI telephone number for prospective customers to call, which prompted another meeting between Douglas and plaintiff. (*Id.*)  Subsequently, two additional instances arose in which Hammons or one of her Itz4Me employees sought approval to place flyers/advertisements for Itz4Me in CPSI employee mailboxes.  (*Id.*)  Such approval was denied by Douglas as "a really bad idea," and he used the occasion to remind Hammons of her primary job.  (*Id.*)  Douglas's Memorandum continued that "the final straw" occurred on October 26 through 28, 2004, when Hammons drove from Mobile to Hawkinsville, Georgia, on CPSI business to meet with representatives of Taylor Regional Hospital.  (*Id.*)  The Memorandum reflected that Hammons traveled with her husband (who was not employed by CPSI), stayed at a luxury hotel in Atlanta (approximately 125 miles northwest

---

[5]     Plaintiffs offer no authentication for this Memorandum; nonetheless, as the authenticity of this Exhibit E is not contested, it will be considered on summary judgment.

[6]     Massey was Hammons' administrative assistant at CPSI from April 1998 through October 2004.  (Plaintiff's Response to Request for Admissions, at #1.)

of Hawkinsville), and "presumably" was "going to market" for Itz4Me "on CPSI time."  (*Id.*)[7]

Before presenting the Memorandum to the Executive Committee, Douglas looked into the Hawkinsville issue.  In particular, CPSI management was alerted to the possible impropriety in Hammons' trip via an anonymous note left on Dye's desk while Hammons was away. (Douglas Dep., at 196.)  The gist of the note was that "there was an ulterior motive for Mellissa going on her trip, check into such-and-such market at the – She's staying at this hotel and she's going to this market, and that's why she's doing it."  (Douglas Dep., at 197.)  Based on that note, CPSI researched the matter and learned that Hammons was staying in an upscale downtown Atlanta hotel and that she was spending three nights there, ostensibly to participate in a single day's meetings in Hawkinsville, some 125 miles southeast of Atlanta.  (*Id.* at 209-10.)  In other words, Hammons had driven more than 100 miles out of her way to stay in a posh Atlanta hotel at CPSI expense.  CPSI's research also revealed that the Atlanta market was in session at that time, and that Itz4Me was registered to attend.  (*Id.* at 210.)  Finally, CPSI verified that Hammons had not requested vacation time for any part of this three-day trip, but was instead counting the entire excursion as CPSI working time.  (*Id.* at 212-13.)  Douglas determined that Hammons had been gone for three entire days "for what should have been a four- or five-hour meeting" in Georgia.  (*Id.* at 217.)  Based on that information, Douglas "assumed that she was going to market" for Itz4Me on her CPSI business trip and proceeded to contact the Executive Board with his recommendation of discharge.  (*Id.* at 210-12.)

In addition to the Itz4Me issue, the Douglas Memorandum chronicled three other "recent incidents" on which the termination recommendation was grounded, to-wit: (a) Hammons' arrival to a Monday morning meeting 10 minutes late on October 11, 2004; (b) Hammons'

---

[7]    The Hawkinsville trip was the only Itz4Me incident that had temporal proximity to the discharge recommendation.  The other Itz4Me incidents referenced in that Memorandum had happened much earlier, such that their relevance is limited to background and context, as opposed to a precipitating force in the discharge decision.  By contrast, Hammons was still away on the Hawkinsville trip when the discharge recommendation was made; therefore, that excursion was the flashpoint for that decision.  As Douglas put it, the Hawkinsville trip was "kind of the straw that broke the camel's back, but I had known for quite a long time that the company, in order to move forward, we needed to terminate her employment."  (Douglas Dep., at 92.)

failure to attend a Monday morning meeting on October 25, 2004, purportedly because she was "stuck in traffic," despite Douglas having instructed her on several occasions that she needed to arrive on time in the mornings to set a good example; and (c) Hammons' initiation of a "major confrontation" with another employee at a conference in September 2004, exhibiting behavior that "was totally inappropriate and unacceptable for an upper level executive," all "in front of several customers."  (Plaintiff's Exh. E.)

In preparing this Memorandum, Douglas did not intend it as an exhaustive description of Hammons' shortcomings, but rather viewed it as "just kind of a basis to get the discussion started  ....  [I]t was, at the time, here's what we want to start the discussion with, and then as I go into the other issues too. ... I knew they were well aware of, again, her reputation, her management style.  They were well aware of that."  (Douglas Dep., at 264.)  The Executive Committee, Dye and Douglas jointly decided to terminate Hammons' employment on October 28, 2004.  (Douglas Aff., at 1.)  There was no dissent.  (Douglas Dep., at 230-31.)   Douglas testified that the reasons for her dismissal were "poor management and insubordination," including her style of "managing by intimidation,"[8] her chronic tardiness (especially for Monday morning meetings, at which she was notoriously late), and her misuse of CPSI resources (personnel and equipment) for the Itz4Me business and for personal purposes.  (*Id.* at 84-86, 89-90.)[9]  That said, Douglas was clear that "first and foremost it was the continued operation of her personal business, Itz 4 Me Stitchery," that led to Hammons' dismissal.  (*Id.* at 89.)  In Douglas's view, Hammons' job performance at CPSI "was continually compromised on a daily

---

[8]      Douglas characterized Hammons' management style as follows: [S]he was just total manage by intimidation type person, very angry. ... It was a routine thing for her to blow up with employees."  (*Id.* at 73.)

[9]      Defendant's summary judgment filings devote extensive attention to chronicling and compiling evidence of Hammons' involvement with Itz4Me, and the accompanying burdens on CPSI equipment and staff.  This evidence is largely irrelevant here.  CPSI never suggests that it was aware of these myriad details at the time that it fired her.  There is no evidence that CPSI launched (much less completed) a comprehensive investigation of Hammons' Itz4Me activities antecedent to terminating her.  Simply put, facts concerning Hammons' Itz4Me business that were unknown to CPSI at the time of the termination decision are not relevant to an assessment of whether that decision was fueled by discriminatory animus.

basis" by her work for Itz4Me.  (*Id.* at 139.)  The Hawkinsville trip was the "triggering" event for the dismissal, as Douglas felt that Hammons had planned this trip as a ruse to perform Itz4Me business.  After all, the timing of that trip from CPSI's standpoint was "extremely odd" because "it just wasn't time to go talk to a customer yet" because some programming needed to be completed first.  (*Id.* at 153.)

On October 29, 2004, plaintiff returned to work at CPSI following her Hawkinsville business trip.  That morning, Douglas informed her that she was being fired for "poor performance and poor leadership" and because she "didn't fit."  (Hammons Aff., ¶ 30.)  Douglas testified that Hammons "didn't fit" because, while other CPSI managers were laid-back and conservative, her management style was characterized by anger, quick temper and intimidation. (Douglas Dep., at 72-73.)  Hammons was 47 years old at the time of her discharge.  She was replaced as Vice President of Financial Software Support by Robert Hinckle, a 35-year old male. (Hammons Aff., ¶ 15.)[10]

### C.    Hammons' Response to the Stated Reasons for Her Dismissal.

Not surprisingly, plaintiff disputes various aspects of Douglas's explanation of the reasons for termination of her employment.

#### 1.    The Itz4Me Issue.

CPSI had no blanket prohibition on outside employment, provided that such employment (a) did not interfere with an employee's performance of CPSI duties, (b) did not pose an actual or potential conflict of interest, and (c) was discussed with the employee's supervisor.  (Douglas Dep., at 117.)  Plaintiff acknowledges that Douglas confronted her in 2001 concerning Itz4Me, and in particular her utilization of CPSI staff (Massey) to perform Itz4Me activities at the Christmas Jubilee.  Specifically, Hammons concedes that Douglas notified her in 2001 in the context of "a long discussion" that she was not to use Massey for Itz4Me activities during

---

[10]    In an odd twist, Douglas initially decided that an employee named Randy Ready would replace Hammons.  (Douglas Dep., at 235.)  Between the time that the decision was made to dismiss plaintiff and the following morning, however, CPSI decided to fire Ready for having an affair with another employee.  (*Id.* at 236-40.)  The company's investigation preceding Ready's discharge was perfunctory, and CPSI never confronted Ready to hear his side of the story.  (*Id.* at 243.)  As it happened, then, Ready was notified of his discharge on the morning of October 29, 2004, approximately one hour before Hammons was fired.  (*Id.* at 232.)

business hours.  (Hammons Dep., at 118-19.)  Douglas did not prohibit Hammons from performing Itz4Me activities at CPSI, but he did caution her that she was "not supposed to run a business" like Itz4Me on CPSI time.  (*Id.* at 120.)  Douglas also admonished her to "[u]se good judgment and be discreet about the business."  (*Id.*)  According to plaintiff, Douglas authorized her to use CPSI equipment for Itz4Me after hours so long as she was discreet.  (Hammons Aff., ¶¶ 19-20.)

When the Itz4Me advertisement with the CPSI telephone number appeared in *Mobile Bay Monthly* a short time later, Douglas told plaintiff, "well, that's not good."  (Hammons Dep., at 125.)  Thus, Hammons acknowledges that she was counseled about the inappropriateness of intertwining CPSI with Itz4Me business on that occasion as well.  Moreover, plaintiff testified that her response to the advertisement was to be "totally apologetic," demonstrating her clear recognition and plain understanding that it was wrong to use CPSI resources for Itz4Me business in that fashion.  (*Id.*)

Hammons avers that, as of October 2004, her "involvement with Itz4Me was practically nil."  (Hammons Aff., ¶ 22.)[11]  With regard to the Hawkinsville trip, Hammons admits that her

---

[11]      Despite that statement, the record is rife with evidence that Hammons had heavily used CPSI resources for Itz4Me business.  She maintained an Itz4Me customer list on her CPSI computer.  (Hammons Dep., at 127.)  Massey's computer included a proposed web page design for Itz4Me.  (*Id.*)  Hammons orchestrated Itz4Me mailings from CPSI's offices approximately four times per year, designing the mailings at CPSI, ordering Itz4Me stationery to be delivered to Massey at CPSI, printing Itz4Me advertising material onto Itz4Me stationery at CPSI, and having Massey print mailing labels for Itz4Me customers on CPSI printers and finalize the mailings at CPSI.  (*Id.* at 130-34.)  Moreover, Hammons maintained a binder at CPSI of all Itz4Me orders, and worked on those orders during CPSI business hours.  (*Id.* at 146-47.)  Hammons repeatedly faxed documents relating to Itz4Me from CPSI's offices using CPSI equipment.  (*Id.* at 149-51.)  Massey maintained bulk quantities of Itz4Me stationery at her CPSI desk, and such stationery was shipped to Massey at CPSI.  (*Id.* at 153-54.)  At various times Hammons arranged for Itz4Me vendors to fax documents to her at CPSI.  (*Id.* at 155.)  Hammons also supplied her CPSI e-mail address to Itz4Me vendors (and even to the Alabama Department of Revenue) and engaged in e-mail communications with them at CPSI.  (*Id.* at 176-81.)  Hammons listed her CPSI telephone number on advertisements when she was trying to sell Itz4Me, and she used CPSI telephones to conduct Itz4Me business.  (*Id.* at 215, 228.)  She occasionally created Itz4Me documents on her CPSI computer during regular CPSI working hours.  (*Id.* at 234.)  This undisputed evidence is irreconcilable with plaintiff's characterization of her Itz4Me involvement as "practically nil."

husband accompanied her in a rental vehicle and that the pair stayed in Atlanta, but maintains
that she "had a prearranged business meeting at Taylor Regional Hospital in Hawkinsville, GA,
on October 27, 2004." (*Id.*, ¶ 27.) Hammons alleges that it was not uncommon for spouses to
accompany CPSI Vice Presidents on business trips and that Douglas was fully aware that
Hammons' husband was going with her on this occasion. (*Id.*) Hammons avers that she
attended the Taylor meeting as scheduled on October 27. (*Id.*, ¶ 29.) The Taylor meeting lasted
from 10:00 a.m. to 5 p.m. that day. (Rabun Aff., ¶ 7.) According to plaintiff, she and her
husband obtained hotel accommodations in Atlanta, rather than Hawkinsville, because a
wholesale market, the AmericasMart, was adjacent to their hotel in Atlanta. (Hammons Dep., at
32.)[12] The AmericasMart was having its fall delivery show on October 26 - 28, 2004, the very
same dates as Hammons' trip. (*Id.* at 33.)[13] She and her husband attended the AmericasMart
event, using the business license for Itz4Me to gain admission, but did not perform Itz4Me
business and instead purchased only personal items for their home. (*Id.* at 32-33, 41, 43;
Hammons Aff., ¶ 28.)

Hammons points to evidence that CPSI officials never asked her about the allegations, or
otherwise confronted her about whether she had used the Hawkinsville trip to serve an ulterior
motive. (Douglas Dep., at 208.) CPSI never sought her side of the story. (*Id.* at 229.) CPSI
never interviewed Massey prior to the termination decision. (*Id.* at 211.) CPSI never contacted
Taylor Regional to see if she had in fact appeared for the meeting. (*Id.* at 223-24.) That said, it
is undisputed that CPSI did collect certain information about the Atlanta trip before deciding to
terminate plaintiff's employment.

       2.    *Other Grounds for Termination.*

With regard to her tardiness, Hammons testified that "as a general rule" she would arrive

---

[12]    AmericasMart is "a wholesale market place for vendors to purchase their goods at
wholesale price." (Hammons Dep., at 34.) Hammons would travel to AmericasMart to conduct
Its4Me business on her personal time two or three times per year. (*Id.* at 36-37.)

[13]    Unrebutted evidence shows that this timing was anything but coincidence.
Massey testified that, before leaving on the trip, Hammons "called [Massey] in her office and she
said isn't it funny that the Atlanta Market is the same time as my trip to Taylor Regional. And
she went hee-hee, you know." (Massey Dep., at 52.)

at work between 8:00 a.m. and 8:15 a.m.  (Hammons Dep., at 184-85.)  There were Monday meetings at 8:00 a.m. which Hammons was required to attend, and she agrees that she was late or missed such meetings on multiple occasions.  (*Id.* at 185.)  However, she also testified that other Vice Presidents were late or missed such meetings on multiple occasions.  (*Id.*)  Plaintiff's brief is silent on this point.

With respect to the September 2004 altercation described in the Memorandum, Hammons defers to the account of that incident set forth in Douglas's deposition.  Douglas testified that in September 2004, Hammons had "one of her explosive confrontations ... a knockdown drag-out, yelling and screaming at this employee right in front of customers and everything."  (Douglas Dep., at 160.)  Thereafter, the other employee involved came to Douglas "crying."  (*Id.* at 161.)  In Douglas's view, Hammons "was way out of line doing that, and that really was what really got [him] irritated with her."  (*Id.*)  Douglas allowed that the other employee had called Hammons a "bitch," which was insubordinate.  (*Id.* at 167-68.)  He reprimanded the other employee, but remained of the view that Hammons' conduct had been entirely inappropriate. (*Id.* at 175.)  Plaintiff does not offer evidence disputing any aspect of Douglas's account, nor does she suggest that younger male managers at CPSI were permitted to engage in explosive public confrontations with their subordinates without adverse repercussions.

　　　　3.　　　*Discriminatory Animus.*

Plaintiff's brief documents various instances in which she contends that company officials made statements that she viewed as indicative of gender bias.  For example, Hammons maintains that Douglas had called her a "bitch," but she was unable to specify the timing or circumstances.  (Hammons Dep., at 112.)  She acknowledged that Douglas did not use that term, or any other derogatory language, in connection with the termination of her employment.  (*Id.*) Hammons also presents evidence that members of CPSI management referred to her as "the bitch of the company" and that Michael Muscat had called her a "bitch."  (Hammons Aff., ¶ 31.)[14] The record is devoid of any indication, however, as to the timing or context of these statements,

---

[14]　　　This evidence was corroborated by Mike Jones, who testified that he had "probably heard" Randy Ready refer to Hammons as "the company bitch."  (Jones Dep., at 70.) Jones indicated that he did not remember the context of this statement, and he was apparently not asked when it occurred.  (*Id.* at 71.)

and plaintiff worked for CPSI for almost 20 years.  Plaintiff further indicates that in 1995, Kenny
Muscat (who at that time was an owner of CPSI) stated upon learning that she was getting
married, "Now you're going to get married and have babies and not be worth anything."
(Hammons Aff., ¶ 10.)  Although Muscat retired from CPSI some time ago, he remained on the
company's 11-member Board at the time of Hammons' dismissal.  (*Id.*, ¶ 12; Plaintiff's Exh. C.)
This comment was nine years removed from the challenged personnel decision.

## II.    **Summary Judgment Standard.**

Summary judgment should be granted only if "there is no issue as to any material fact
and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The
party seeking summary judgment bears "the initial burden to show the district court, by reference
to materials on file, that there are no genuine issues of material fact that should be decided at
trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party
has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a
genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing
on an essential element of her case with respect to which she has the burden of proof,' the
moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S.
317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden,
the court must stop short of weighing the evidence and making credibility determinations of the
truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable
inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999
(11th Cir. 1992) (internal citations and quotations omitted).   However, the mere existence of any
factual dispute will not automatically necessitate denial of a motion for summary judgment;
rather, only factual disputes that are material preclude entry of summary judgment.  *Lofton v.
Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004).

The Eleventh Circuit has expressly rejected the notion that summary judgment should
seldom be used in employment discrimination cases because they involve issues of motivation
and intent.  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004).  Rather, "the
summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to
be placed on either side of the scale."  *Id.* at 1086 (citation omitted).

### III.     Analysis.

#### A.     *McDonnell Douglas Burden-Shifting Standard.*

Absent direct evidence of discrimination,[15] Hammons must make a showing of circumstantial evidence which satisfies the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  Under this familiar, tripartite burden-shifting analysis, plaintiff is required to make out a *prima facie* case of gender and age discrimination.[16]  If she does so, that showing "creates a rebuttable presumption that the employer acted illegally."  *Underwood v. Perry County Com'n*, 431 F.3d 788, 794 (11th Cir. 2005).  At that point, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for [the adverse employment action]. ... If the employer does so, the burden shifts back to the plaintiff to introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination."  *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1457 (11th Cir. 1997) (citations omitted); *see also Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006).  A plaintiff may establish pretext "either

---

[15]     Both parties' briefs rely exclusively on a *McDonnell Douglas* inferential analysis, rather than a "direct evidence" analysis.  Given the record evidence that CPSI managers referred to her as a "bitch" and the like, plaintiff might have formulated a colorable argument that such statements were direct evidence of sex discrimination.  *See, e.g., Wilson*, 376 F.3d at 1086 (observing that direct evidence of discrimination is "evidence that, if believed, proves the existence of a fact without inference or presumption," but is confined to "only the most blatant remarks"); *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 472 (11th Cir. 1999) (explaining that direct evidence shifts burden of persuasion to employer); *Taylor v. Runyon*, 175 F.3d 861, 867 n.2 (11th Cir. 1999) (if trier of fact accepts direct evidence that defendant acted with discriminatory motive, then ultimate issue of discrimination is proved).  Nonetheless, given the rigorous standards for the direct evidence method of proof, plaintiff wisely eschewed that argument here, because such an approach would have failed on this evidentiary showing.  *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("[R]emarks ... unrelated to the decisionmaking process itself are not direct evidence of discrimination."); *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227-28 (11th Cir. 2002) (holding that decisionmaker's comment made before and not directly related to plaintiff's termination was not direct evidence of discrimination).  Accordingly, the Court will rely exclusively on the inferential mode of analysis, just as the parties have done.

[16]     Hammons' burden of establishing a *prima facie* case is not heavy.  *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001) ("the *prima facie* requirement is not an onerous one").

directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Brooks v. County Com'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation omitted); *see also Wilson*, 376 F.3d at 1088 (similar). The ultimate burden of persuasion remains with the plaintiff. *See E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002). Thus, "[i]f the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (*en banc*).

A plaintiff establishes a *prima facie* case of discriminatory discharge in violation of Title VII or the ADEA by showing that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she "was replaced by a person outside [her] protected class or was treated less favorably than a similarly-situated individual outside [her] protected class." *Maynard v. Board of Regents of Div. of Universities of Florida Dep't of Educ. ex rel. University of South Florida*, 342 F.3d 1281, 1289 (11th Cir. 2003); *see also Chapman*, 229 F.3d at 1024 (in termination context, fourth element of *prima facie* case under ADEA is that plaintiff "was replaced by or otherwise lost a position to a younger individual"); *Coutu v. Martin County Bd. of County Com'rs*, 47 F.3d 1068, 1073 (11th Cir. 1995) (in termination case, *prima facie* case requires showing that plaintiff was replaced by a person outside the protected class).[17]

**B.      Plaintiff Has Established a Prima Facie Case.**

As an initial basis for its Rule 56 motion, CPSI maintains that Hammons cannot establish a *prima facie* case of age or sex discrimination. In that regard, defendant concedes that three of the four elements are satisfied, to-wit: that Hammons belongs to a protected class, that she was qualified to do the job, and that she suffered an adverse employment action. (Defendant's Brief

---

[17]      Eleventh Circuit precedent has made clear that the *McDonnell Douglas* framework applies with equal force to Title VII claims and age discrimination claims under the ADEA. *See, e.g., Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1082 (11th Cir. 2005); *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989) (plaintiff may establish *prima facie* case under ADEA by meeting *McDonnell Douglas* test for Title VII cases).

(doc. 27), at 11.)  However, CPSI asserts that the remaining element is not satisfied here because Hammons has not demonstrated that she "and whatever employee she identifies as a comparator [are] similarly situated in all relevant respects."  (*Id.*)  This line of reasoning mis-states the elements of the *prima facie* test in the context of a claim for discriminatory discharge by instead applying the elements for a generic disparate treatment case.  The elements of a *prima facie* test shift slightly depending on the nature of the claim asserted.  As *Maynard*, *Chapman*, *Coutu* and other Eleventh Circuit cases have explained, a plaintiff alleging discriminatory discharge may satisfy the fourth element of the *prima facie* test by demonstrating that she "was replaced by a person outside [her] protected class."  *Maynard*, 342 F.3d at 1289; *see also Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1082 (11th Cir. 2005) ("*McDonnell Douglas* requires the plaintiff to establish a prima facie case which includes identifying an individual who replaced him or was treated better than he was who was not a member of his protected class (here an older male).").  The record reflects that CPSI replaced Hammons with a male who was 12 years younger.  Nothing more is needed to satisfy this element; therefore, Hammons has plainly met her *prima facie* burden.

> ### C.   Employer's Burden of Production.

Hammons having made the requisite *prima facie* showing, it becomes incumbent on CPSI to articulate legitimate nondiscriminatory reasons for terminating her employment.  Defendant has done so.  Indeed, the principal decisionmaker, Douglas, testified that CPSI fired Hammons for the following reasons: poor management (including her style of "managing by intimidation"), insubordination, chronic tardiness, and misuse of CPSI resources (personnel and equipment) for the Itz4Me business and for personal purposes.[18]  Such a showing is clearly adequate to satisfy the employer's modest burden of production, and plaintiff does not suggest otherwise.  *See Vessels v. Atlanta Independent School System*, 408 F.3d 763, 769-70 (11th Cir. 2005) (employer's burden is exceedingly light, and is satisfied as long as employer articulates clear and reasonably specific non-discriminatory basis for its actions).

---

[18]   Douglas's testimony is echoed by defendant's principal brief, which states that "CPSI's decision to fire Hammons was based on her excessive tardiness, operation of 'Itz4Me' from CPSI and during CPSI business hours, utilization of CPSI personnel for operation of her personal business and personal errands; and poor job performance."  (Doc. 27, at 13.)

   **D.    Pretext.**

Defendant having met its burden, "the employee must come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were a pretext for discrimination." *Vessels*, 408 F.3d at 771. "This evidence must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Id.* (citations omitted). To meet this burden, plaintiff argues that defendant's stated reasons for discharging Hammons are inconsistent and contradictory, that the Itz4Me rationale for termination suffers from several deficiencies, and that Hammons was treated differently than other CPSI employees who engaged in similar misdeeds. Each of these contentions will be addressed in turn.

   *1.    Alleged Inconsistencies and Contradictions.*

Plaintiff's principal pretext argument is that defendant's stated reasons for her termination have evolved and morphed over time, resulting in inconsistencies and contradictions. As a matter of law, plaintiff is absolutely correct that such discrepancies, if they exist, may be sufficient to establish pretext. *See, e.g., Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) ("We have recognized that an employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext."); *Vessels*, 408 F.3d at 771 (plaintiff's pretext burden requires showing of "weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons"). Nonetheless, close inspection of the record and defendant's briefs reveals that the alleged inconsistencies and contradictions are non-existent, and that CPSI has in fact hewed to a constant theme in explaining its decision to dismiss Hammons.

According to plaintiff, Douglas told her at the time of her discharge that she was being fired for "poor performance and poor leadership," and because she did not "fit in" at CPSI. Yet in the EEOC proceedings, Douglas explained that Hammons was discharged because of incidents relating to Itz4Me over a period of years, utilization of Massey to perform Itz4Me business, tardiness, abusiveness towards her subordinates, and low morale in her department. Plaintiff argues that Douglas's justification to the EEOC is inconsistent with that conveyed to Hammons at the time of her dismissal, because he never mentioned Itz4Me, abusive behavior,

tardiness or morale to her.  Thus, according to plaintiff, Douglas's explanation to the EEOC "is inconsistent and contradictory of the reasons offered to Ms. Hammons in her termination." (Plaintiff's Brief, at 23.)  This argument is devoid of merit.  Under any reasonable reading, every reason recited by Douglas to the EEOC fits neatly under the headings of poor performance, poor leadership, and/or a poor fit, the very explanations communicated to Hammons contemporaneously with her discharge.  Plaintiff's characterization of defendant as "telling a Plaintiff different reasons than are subsequently given to the EEOC" (Plaintiff's Brief, at 24) is unsupported by the evidence and cannot be adopted as a sufficient showing of pretext.[19]  Nothing in Title VII or the ADEA requires an employer to enumerate to an employee in painstaking detail every incident or concern upon which an adverse employment decision is predicated.  And of course, no inference of pretext can be drawn from the fact that CPSI opted to explain its termination decision in greater detail to the EEOC than it did to Hammons.

At most, plaintiff has isolated a single inconsistency in the summary judgment record.  In particular, at the very end of his six-page EEOC affidavit, Douglas averred that he had learned that one of Hammons' supervisees (Ready) had been having sexual relations with his subordinate employees, that Hammons had been aware of this situation, and that "[a]ny condolence" of such activity by a Vice President of CPSI would be unacceptable.  (Douglas Aff., at 6.)  In his deposition, Douglas admitted that he did not become aware of Hammons' knowledge of Ready's dalliances until after the fact, and that he therefore did not rely on that information in firing her.  (Douglas Dep., at 242, 259-60.)  There is no obvious contradiction here, inasmuch as Douglas's affidavit does not expressly specify that he fired Hammons for

---

[19]    The same conclusion holds true with respect to plaintiff's attempts to conjure up apparitions of inconsistencies in CPSI's documentation.  For example, plaintiff would impute contradiction from the fact that Douglas's Memorandum omitted reference to Massey's expenditure of 50% of her time on Itz4Me, plaintiff's habitual lateness for work, her abusiveness toward employees, or the deteriorating morale of her subordinates.  (Plaintiff's Brief, at 24.)  In the first place, this argument is factually incorrect because the Memorandum documents her chronic tardiness and her "totally inappropriate and unacceptable" confrontation of a subordinate.  In the second place, this argument ignores the undisputed evidence that Douglas did not frame the Memorandum as an exhaustive, particularized inventory of every defect in Hammons' performance, but instead designed it as a discussion-starter, particularly because board members were already well aware of her performance issues.

giving tacit approval to Ready's activities.  Indeed, plaintiff acknowledges that the Douglas Affidavit mentions this point "almost as an aside."  (Plaintiff's Brief, at 23.)  Even if that affidavit excerpt did give rise to such an inference, however, it would not suggest any pretext as to the various other unrebutted reasons for discharge described in the affidavit.  That there may be some discrepancy as to one tangential aspect of Douglas's narrative in no way supports an inference that all of the stated reasons for plaintiff's dismissal were a mere pretext for gender- and age-based discriminatory animus.

                2.     *Itz4Me.*

As a secondary position, plaintiff argues that there is weakness and implausibility in defendant's explanation that she was fired for operating Itz4Me and for conscripting Massey for that purpose.  Plaintiff objects that most of the Itz4Me incidents cited in the Memorandum had occurred more than two years earlier and that Douglas had authorized her to use CPSI equipment after hours for Itz4Me.  (Plaintiff's Brief, at 25.)  But this argument conveniently ignores undisputed facts in the record to fashion a contorted picture of the circumstances facing the company in October 2004.  Viewed most favorably to plaintiff, the evidence reflects that at the time of Hammons' firing, CPSI understood the following to be true: (i) there had been longstanding issues concerning Hammons' operation of Itz4Me using CPSI resources on CPSI time, dating back to 2001; (ii) the company had authorized her to use CPSI equipment to perform Itz4Me work outside of regular business hours so long as she was discreet; (iii) Hammons and her husband drove from Mobile on a three-day business trip to Hawkinsville, Georgia, the timing of which CPSI management felt was extremely odd given the posture of the account; (iv) the duration of the trip seemed excessive, because Hammons was spending three paid working days for CPSI to attend a five- or six-hour meeting within driving distance of Mobile; (v) after receiving an anonymous note, CPSI learned that Hammons was staying in an upscale downtown Atlanta hotel, more than 100 miles northwest of the client's offices and hence far out of the way of her CPSI business activities; (vi) the timing of Hammons' trip coincided with a trade show happening next door to said upscale Atlanta hotel; (vii) Itz4Me was registered to attend the trade show; and (viii) Hammons had not requested vacation time for the Hawkinsville trip, so she was

-16-

"on the clock" for CPSI the entire time.[20]

Considering all of these record facts, it is clear that the 2001 and 2002 Itz4Me incidents presented in the Douglas Memorandum simply provide context for the Hawkinsville trip, which was the precipitating event for Hammons' termination.   Far from firing her for events that happened three years earlier, CPSI merely considered the Hawkinsville trip to be all the more egregious because of the longstanding history of lapses in judgment with Hammons' Itz4Me activities.  No reasonable finder of fact could conclude based on the Memorandum's citation of "old news" that the Itz4Me issue was not the real reason for Hammons' firing, but was a mere pretext or subterfuge for age and sex discrimination.

To the extent that Hammons would derive pretext from CPSI's failure to investigate the Itz4Me issue further before firing her, the law is squarely against her.  It may have been prudent, compassionate or simply advisable for CPSI to confront Hammons with the allegations and hear her side of the story before taking adverse action.  The failure to do so may have been precipitous, arbitrary, or downright unfair.  But Title VII and the ADEA do not charge this Court with evaluating the equities or the soundness of a defendant's personnel practices. "We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law.  We are not in the business of adjudging whether employment decisions are prudent or fair.  Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Wascura v. City of South Miami*, 257 F.3d 1238, 1247 (11th Cir. 2001) (citation omitted).   On that metric, plaintiff's evidence comes up short.[21]

---

[20]        "[I]n order for an employer's proffered non-discriminatory basis for its employment action to be considered honestly held, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).  This is precisely what CPSI has shown here, through record evidence of the aforementioned facts.

[21]        Besides, the record reflects that the "quick hook" utilized by CPSI in firing Hammons was applied with equal alacrity to male managers.  Indeed, approximately one hour before discharging Hammons, CPSI terminated the employment of Randy Ready, her anointed successor as Vice President, based on an even shorter investigation in an even more compressed time frame.  As with Hammons, CPSI never confronted Ready about the allegations against him

Hammons criticizes defendant for not having discussed Itz4Me with her in the two years before her dismissal, and points to record evidence that (unbeknownst to CPSI) her role in Itz4Me had diminished considerably in the interim.  But none of that matters, in the framework of the instant Title VII and ADEA analysis.  Nothing in Title VII or the ADEA requires a dialogue of the sort contemplated by plaintiff.  Additionally, if an employer holds an honest, good-faith belief in the reason for an employee's dismissal, such a reason is not proven pretextual even if the employer's honest, good-faith belief is later proved incorrect or mistaken.  *See E.E.O.C. v. Total System Services, Inc.*, 221 F.3d 1171, 1176-77 (11th Cir. 2000) (affirming summary judgment for defendant where employee was fired for lying in investigation, and plaintiff offered no evidence that defendant lacked a good faith belief that employee had lied).[22]  Indeed, "[a]n honest belief in the nondiscriminatory reason offered by the decision-maker will be sufficient even if the reasons are foolish, trivial, or even baseless."  *Smith v. AT&T Broadband Network Solutions, Inc.*, 2002 WL 370217, *12 (N.D. Ill. Mar. 8, 2002).  On the record presented here, no reasonable factfinder could conclude that CPSI did not harbor a good-faith belief that Hammons was in Atlanta in October 2004 to perform Itz4Me business on CPSI time and at CPSI expense.  Plaintiff has not made an adequate showing of pretext.

Similarly, Hammons alleges that her alleged misuse of Massey for Itz4Me purposes could not have been a reason for her discharge because Douglas never learned that Massey was being forced to perform Itz4Me and other personal work for Hammons until after Hammons' discharge.  But a close look at Douglas's deposition testimony reveals CPSI's honest, good-faith

---

before firing him.  Hammons (a woman) and Ready (a man) were treated identically in that respect.  To be sure, enlightened human resources practice might commend a more searching investigation before terminating management employees for misconduct; however, that omission has no bearing on the merits of Hammons' discrimination claims.

[22]     *See generally Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct."); *Wilson*, 376 F.3d at 1092 (where employee was discharged for insubordination, her self-serving assertion that she was not insubordinate does not establish that she was terminated because of gender, and whether employee's conduct was insubordinate is not an issue for federal courts to referee); *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002) ("We are not interested in whether the conclusion is a correct one, but whether it is an honest one.").

belief that such was the case.  When asked whether anyone had told him that Massey had been forced to do Itz4Me work, Douglas responded, "I don't know that anybody told me, but that was certainly my impression ... [b]ased on past history and things."  (Douglas Dep., at 246.)  Douglas elaborated that Massey "had not come to me directly, but I was aware of the – of the conditions that she was having to work under.  I was watching it, it was happening under my own eyes.  She didn't need to come to me, it was obvious."  (*Id.* at 247.)  In light of this testimony, no inference of pretext may be drawn from CPSI's reference to Massey being forced to perform work for Itz4Me, even though Massey never specifically reported that information to the company before Hammons' dismissal.  The record is clear that Douglas had formed a good-faith, honest belief that this was happening, based on his own personal observations.  While it might have been prudent to investigate the facts and confirm those observations, the law did not require CPSI to do so.  On this evidence, no reasonable finder of fact could determine that CPSI's explanation that Hammons was fired for misusing CPSI personnel was a pretext for unlawful discrimination.

     *3.    Comparators.*

Apparently, Hammons maintains on summary judgment that younger male CPSI managers/executives engaged in similar conduct to her Itz4Me business, without suffering any adverse consequences, and certainly without being discharged.[23]  However, none of the employees identified by plaintiff was similarly situated to her, so as to raise any inference of disparate treatment or pretext in the company's stated reasons for firing her.

Plaintiff first identifies Scott Schneider, a CPSI Vice President from 1999 through 2005.  (Schneider Dep., at 13-16.)  The record reflects that Schneider owned a 9% ownership interest in Cohassett Timberlands, LLP, from 2002 through 2004, and that Cohassett was formed for the singular purpose of purchasing one tract of timberland as an investment.  (*Id.* at 26-29.)  It is undisputed that Schneider's Cohasset activities "had absolutely zero to do with anything he did

---

[23]    Plaintiff's 27-page memorandum of law does not expressly articulate, much less develop, this contention as part of her legal argument.  Nonetheless, that brief does present in some detail the record facts concerning various male employees.  That information is relevant to Rule 56 issues only insofar as it might lend credence to a pretext argument predicated on CPSI's failure to discipline or terminate male managers who engaged in transgressions similar to Hammons' Itz4Me activities.  It is in that spirit that this evidence will be reviewed.

at CPSI." (Douglas Dep., at 266.) Schneider's largely passive activity of holding a small minority interest in a timber partnership for investment purposes bears no similarity to Hammons' conduct of devoting substantial personal and corporate resources to the operation of a side business on an ongoing basis for a period of years. Thus, the Schneider evidence is wholly unavailing to Hammons' efforts to establish disparate treatment.

Next, plaintiff points to Rob Ladner and Mike Jones, two CPSI employees who operated an outside business, WebSouth Services, from 1996 through 1999. (Ladner Dep., at 24-25.) WebSouth was in the business of creating Web pages for companies. (*Id.* at 26-27.) Ladner's testimony was that WebSouth "was something that we did on the weekends" and that the business folded because the principals grew weary of working on their home computers at "ten or eleven o'clock at night" or on a Sunday night, on WebSouth business. (*Id.* at 41-43.) Ladner testified that he "may have made one or two calls" for WebSouth at CPSI on his cell phone during lunch breaks. (*Id.* at 44-45.) Ladner was emphatic that he never worked on WebSouth web pages using CPSI computers, that he never talked to his WebSouth co-owners about WebSouth business during the workday at CPSI, that he never faxed documents to WebSouth customers using CPSI equipment, and that he never called on WebSouth customers while on trips for CPSI. (*Id.* at 47-49.)[24] All of WebSouth's software and work was kept exclusively on Ladner and Jones' home computers. (*Id.* at 48.) There is no evidence that the WebSouth entrepreneurs ever used CPSI resources or spent CPSI time on their side business, much less that CPSI ever became aware of any such activities.[25] Moreover, it is undisputed that Ladner and

---

[24] Jones fully corroborated Ladner's testimony on these points. Jones testified that he designed all the WebSouth pages from his house. (Jones Dep., at 36.) When asked if he ever contacted CPSI customers for WebSouth, Jones responded, "No, absolutely not." (*Id.* at 38.) Jones denied ever working on a WebSouth page at CPSI, whether during or after normal work hours. (*Id.* at 46, 47.) As Jones put it, "I did it all from home." (*Id.* at 47.)

[25] At most, Hammons testified that on one occasion at CPSI she overheard Ladner and Jones discussing "the design of a particular web page for a particular hospital." (Hammons Dep., at 105-06.) There is no indication that this discussion related to WebSouth business; to the contrary, the undisputed evidence is that WebSouth's business was confined to deer hunting companies, beach real estate rentals, and a coffee shop in Midtown Mobile. (Jones Dep., at 43.) There is no evidence that WebSouth ever did web site development for hospitals, although CPSI in fact did that kind of work for its hospital clients beginning in 2000 or 2001 (after WebSouth

Jones were not in upper management positions at the time; indeed, Ladner was working in systems installation, while Jones was a support representative. (*Id.* at 27; Jones Dep., at 26.)[26] Thus, taking the evidence in the light most favorable to plaintiff, the circumstances of Ladner and Jones are in no way analogous to those of Hammons, and do not bolster her claims.

In her continuing quest to identify comparators, Hammons next points to Scott Odom, a CPSI employee who was selling Amway products on the side. (Schneider Dep., at 52.) However, the evidence is that Odom was fired, at least in part, for doing Amway work on company time. (*Id.*; Douglas Dep., at 270.) Thus, Odom's circumstances do not bolster Hammons' contention that CPSI turned a blind eye towards younger male employees' outside business activities, while discharging her for such conduct.

Plaintiff also insists that CPSI's ire at her for retaining her direct subordinate, Massey, to perform Itz4Me work is pretextual because other company executives used subordinates for personal activities. Plaintiff focuses on Rob Waite, who is CPSI's maintenance supervisor and whose salary is approximately one-tenth of Hammons' Vice President salary. (Waite Aff., at 1.) Outside of his CPSI duties and outside of his CPSI work hours, Waite operates a business called Waite's Lawn Care. (*Id.*) In this capacity, Waite has performed yard work for Douglas, Dye and other CPSI executives outside of business hours, for which he was paid by those executives. (Douglas Dep., at 148.) There is no evidence that any CPSI executive ever asked or pressured Waite to provide lawn care service to them; to the contrary, the evidence is that Waite badgered

---

had shut down). (*Id.* at 15-17.) Thus, the only reasonable inference to be culled from Hammons' testimony is that she walked in on Ladner and Jones discussing CPSI business concerning web site design for a CPSI customer. Plainly there was nothing improper about two CPSI employees discussing CPSI business in their areas of expertise while on company time.

[26]     In fact, Jones testified that part of the reason for shutting down WebSouth was that CPSI was considering Jones and Ladner for management positions. As Jones explained, "If I was going to manage people, I didn't think I should have – be doing it anymore if I was in a management position. The other thing was ... I didn't feel like I could be on call in the evenings for CPSI and still be doing [WebSouth] in the evenings." (Jones Dep., at 44.) Far from being comparable to Hammons, then, Jones and Ladner ended their side business to avoid being placed in the uncomfortable, divided position in which Hammons voluntarily thrust herself through her continued operation of Itz4Me at CPSI. Hammons chose a drastically different path than her would-be comparators.

Douglas for years before Douglas relented and allowed him to service his yard.  (Waite Aff., at 2.)  That CPSI executives agreed to allow Waite to cut their grass for a fee outside of CPSI work hours is in no way inconsistent with CPSI's taking adverse action against Hammons for asking, directing or permitting Massey to perform Itz4Me work during normal CPSI business hours in CPSI's offices and using CPSI equipment and facilities.  In any event, the undisputed evidence is that Waite (much like Hammons) was instructed never to do Waite Lawn Care business on CPSI time, and was warned that he would be fired if he ever performed personal work on CPSI time, or if he ever utilized CPSI employees during CPSI time to conduct Waite Lawn Care business. (Douglas Dep., at 149-50; Waite Aff., at 2.)  If anything, then, the record confirms that CPSI treated Waite the same as Hammons, with the only difference being that Waite heeded CPSI's warning while Hammons did not.

Finally, plaintiff contends that the male Vice Presidents at CPSI engaged in various time-squandering personal pursuits while on company time.  According to Hammons, male Vice Presidents would play golf and plan fishing trips during CPSI working hours.  (Hammons Aff., ¶ 24.)  A CPSI employee named Patrick Rehm allegedly left work to play golf with Denny Wilkins, who was CPSI's President until 1999.  (*Id.*; Wilkins Aff., at 1.)  Certain male employees would take "extensive lunches" because they would go to the gym to exercise at lunchtime.  (Hammons Aff., ¶ 24.)  Senior executives would leave CPSI during work hours to check on home improvement projects.  (*Id.*)  One CPSI manager and his wife met with their financial planner at CPSI.  (*Id.*)  Apparently, Hammons would have this Court conclude that these types of activities are commensurate with using CPSI resources and personnel to perform work for a side business on company time.  But the activities for which Hammons was discharged are vastly different in kind and degree from those which she ascribes to her male colleagues.  No discriminatory inference can be drawn from CPSI's decision to fire Hammons for engaging in a side business on company time, while not punishing male managers for going to the gym on a long lunch hour or meeting with a financial planner during work hours.  These kinds of activities cannot reasonably be deemed analogous.

        *4.      Plaintiff's Other Arguments.*

In a last-ditch effort to show pretext, plaintiff proffers a grab-bag of other arguments. First, she suggests that her status as the lone female Vice President means that her dismissal

must have been discriminatory.  (Plaintiff's Brief, at 26.)  Such an inference would be unreasonable.  Courts will not presume that simply because a plaintiff is the only employee of a given protected class at a given stratus of management, any adverse employment action taken against her must be based on gender.  There is neither evidence nor suggestion that any qualified female candidates have ever sought or expressed interest in any other Vice President slot at CPSI.  Without more, Hammons' status as the only female Vice President at the company is not a sufficient factual basis for concluding that her termination was based on her gender.

Second, Hammons protests that she "had not one shred of negative documentation in her personnel file."  (Plaintiff's Brief, at 26.)  Her file is indeed devoid of disciplinary documentation.  (Douglas Dep., at 65, 143, 145; Plaintiff's Exh. L.)  In certain circumstances, such an omission may be evidence of pretext.  *See Wascura*, 257 F.3d at 1245 (recognizing that lack of complaints or disciplinary reports in personnel file may theoretically support finding of pretext, but finding no pretext where there was no formal review process for employees in plaintiff's position).  Here, however, plaintiff has not laid the proper predicate to support such an inference.  She has not shown that CPSI had a practice or policy of completing disciplinary write-ups for Vice Presidents, as would be necessary for the absence of such documentation to trigger an inference of fabrication.  To the contrary, the uncontradicted evidence is that CPSI did not have a progressive disciplinary policy of verbal and written reprimands for upper-level employees because the company did not view it as necessary.  (Douglas Dep., at 119.) Douglas's practice was not to document performance or behavior issues for Vice Presidents because "if you get to the level at where Mellissa was, the vice president level, it's crazy to have to do something like that."  (*Id.* at 144.)[27]  Given that CPSI did not apply a progressive discipline policy or prepare written disciplinary reports for upper management employees, no inference of pretext can be drawn by the paucity of documentation of performance deficiencies in Hammons' personnel file.

Third, to the extent that Hammons would rely on evidence that on isolated occasions in

---

[27]    Douglas rejected the notion that he should have given written directives to a Vice President of CPSI to do her job.  Indeed, he testified that "[t]hat would have been ridiculous to have to do that to someone in her position."  (Douglas Dep., at 62.)

her 20-year employment at CPSI she may have been called a "bitch" or "the company bitch" by other employees, such stray remarks, taken in the context of the entire record in this case, are too attenuated and remote to the circumstances of her dismissal to lend support to any reasonable inference that her termination was based on her gender.  *See, e.g., Ash v. Tyson Foods, Inc.*, 2006 WL 2219749, *2 (11th Cir. Aug. 2, 2006) (explaining that stray remarks not uttered in context of challenged personnel actions are not sufficient circumstantial evidence to provide a reasonable basis for a finding of discrimination in the context of the employment decisions at issue); *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291-92 (11th Cir. 1998) (indicating that stray remarks may provide circumstantial evidence to support a reasonable inference of discrimination, but must be viewed in conjunction with entire record in determining whether they might lead a reasonable jury to disbelieve proffered reason for challenged adverse employment action).

Fourth and finally, plaintiff would apparently seek to create an inference of pretext from the fact that her discharge came as a surprise to her.  The record reflects that Hammons' termination was a "shock," that she "was completely surprised," that she "had no warning at all," and that she was never told that her job was in jeopardy.  (Hammons Aff., ¶ 43; Douglas Dep., at 233.)  Perhaps plaintiff's firing did come to her as a totally unanticipated bolt from the blue. That she did not expect it, and had not been warned that it might be in the offing if she did not mend her ways, might have evinced poor human resources practices, but it is in no way emblematic of unlawful discrimination.  A firing is not rendered discriminatory simply because a plaintiff did not know it was coming.

For all of the foregoing reasons, after careful analysis of the entire summary judgment record, the undersigned concludes that Hammons has not adduced evidence sufficient to generate a genuine issue of fact that the reasons proffered by CPSI for her discharge in October 2004 were a pretext for unlawful discrimination.

## IV.    Parties' Respective Motions to Strike.

In the aftermath of summary judgment briefing, both parties prolonged the briefing process by filing motions to strike.  Defendant filed a 10-page Motion to Strike Portions of the Affidavit of Mellissa Hammons (doc. 33), taking issue with no fewer than 15 separate paragraphs of her Affidavit, largely on grounds that the statements therein are immaterial or irrelevant.  Plaintiff responded with a 10-page Objection (doc. 37) to the Motion to Strike,

offering a point-by-point rebuttal to defendants' arguments.  The Court need not wade into this collateral matter or expend its resources resolving more than a dozen evidentiary disputes presented in this briefing, for the simple reason that regardless of how those evidentiary issues are resolved, the Rule 56 analysis and outcome would not be materially affected.  Accordingly, defendant's Motion to Strike is **moot**.

Additionally, plaintiff filed a Motion to Strike Untimely Evidentiary Filings (doc. 38), seeking to strike the affidavits and exhibits that CPSI filed with its reply brief.  As a general rule, of course, affidavits must be filed and served with a motion.  *See* Rule 6(d), Fed.R.Civ.P. ("when a motion is supported by affidavit, the affidavit shall be served with the motion").[28]  But nothing in the extant authorities, or in the Federal Rules of Civil Procedure, forbids a movant from making supplemental record submissions in a reply brief to rebut specific arguments raised by the non-movant's opposition brief.  *See generally Baugh v. City of Milwaukee*, 823 F. Supp. 1452, 1457 (E.D. Wis. 1993) ("where the reply affidavit merely responds to matters placed in issue by the opposition brief and does not spring upon the opposing party new reasons for the entry of summary judgment, reply papers-both briefs and affidavits-may properly address those issues"); *Viero v. Bufano*, 925 F. Supp. 1374, 1380 (N.D. Ill. 1996) ("if Viero has raised an issue not dealt with by defendants in their initial filing, it is appropriate for defendants to support their final response with properly admissible evidence").  To ban such evidentiary filings would yield absurd results, as movants would be permitted to submit reply briefs but precluded from submitting the necessary record materials to support them.  Here, CPSI's objected-to supplemental evidentiary submission merely responds to arguments and issues raised in plaintiff's opposition (albeit in a manner incorporating hundreds of exhibits that could have been filed earlier), without proffering new grounds for entry of summary judgment.  There is nothing

---

[28]     *See generally United States v. Gericare Medical Supply Inc.*, 2000 WL 33156443, *10  (S.D. Ala. Dec. 11, 2000) (declining to consider movant's argument in reply brief that exceeds scope of motion to dismiss, as such an argument is not properly before the court); *Martinez v. Weyerhaeuser Mortg. Co.*, 959 F. Supp. 1511, 1515 (S.D. Fla. 1996) ("the Court finds that the movant may not raise new arguments in a reply brief"); *United States v. Feinberg*, 89 F.3d 333, 341 (7th Cir. 1996) ("The reply brief is not the appropriate vehicle for presenting new arguments or legal theories to the court.")

improper about CPSI's supplemental submissions, and plaintiff's Motion to Strike is **denied.**[29]

V.     **Conclusion.**

For all of the foregoing reasons, it is hereby **ordered** as follows:

1.     Defendant's Motion for Summary Judgment (doc. 26) is **granted** and plaintiff's claims are **dismissed with prejudice** in their entirety.

2.     Defendant's Motion to Strike (doc. 33) is **moot**.

3.     Plaintiff's Motion to Strike (doc. 38) is **denied**.

4.     A separate judgment will enter.

DONE and ORDERED this 11th day of December, 2006.


s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

[29]     Plaintiff's protests of unfairness that she never had an opportunity to respond to these supplemental evidentiary materials are misplaced for three reasons.  First, nearly all of these materials were available to her during the discovery process, so she was well aware of their contents at the time she filed her opposition brief.  Plaintiff cannot legitimately complain of surprise, ambush, or prejudice.  Second, had she truly felt strongly about the need to respond to those supplemental evidentiary materials, plaintiff could have petitioned the Court for leave to file a sur-reply addressing those narrow issues.  She did not.  And third, at any rate, the vast majority of these materials have not been relied on by the undersigned in this Order, and have had no impact on the summary judgment ruling.